**UNITED STATES, Appellee**

v.

**Staff Sergeant Arthur MASON, Jr.,
United States Army, Appellant**

**ARMY 9601811.**

U.S. Army Court of Criminal Appeals.

27 Jan. 2003.

For Appellant: Richard T. McNeil, Esq. (argued); Mary Ramsay McCormick, Esq. (on brief); Captain Linda A. Chapman, JA.

For Appellee: Captain Tami L. Dillahunt, JA (argued); Colonel Steven T. Salata, JA; Lieutenant Colonel Denise R. Lind, JA; Major Paul T. Cygnarowicz (on brief); Lieutenant Colonel Lauren B. Leeker, JA; Major Mark L. Johnson, JA.

Before CANNER, Senior Judge, HARVEY, and BARTO Appellate Military Judges.

## OPINION OF THE COURT ON FURTHER REVIEW

HARVEY, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of rape, aggravated assault with a dangerous weapon, burglary, and communication of a threat in violation of Articles 120, 128, 129, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 928, 929, and 934 [hereinafter UCMJ], on 2 November 1996. The convening authority approved the adjudged sentence to a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, and reduction to Private E1. The forfeitures were deferred on 10 December 1996 until action, and at action were waived for six months with direction that the forfeitures be paid to appellant's wife and three children. This court set aside the findings of guilty and the sentence because the military judge erroneously failed to grant a challenge for cause against a court member; a rehearing was authorized. *United States v. Mason,* ARMY 9601811 (Army Ct.Crim.App. 30 Jun. 1999) (unpub.).

Appellant was retried before a general court-martial composed of officer and enlisted members and, contrary to his pleas, on 31 March 2000, was convicted of rape and burglary in violation of Articles 120 and 129, UCMJ. He was sentenced to a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, and reduction to Private E1. On 18 October 2000, the convening authority approved only so much of the sentence as provides for a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, and reduction to Private E1.[1] The convening authority

credited appellant with 992 days of confinement credit.

In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, defense appellate counsel assert, *inter alia,* that trial counsel's redirect examination of its deoxyribonucleic acid (DNA) expert improperly shifted the government's burden of proof to appellant and that the evidence is factually insufficient to support the findings. We disagree.

### Facts

At 0529 Specialist (SPC) P, who lived in quarters on Fort Riley with his wife and two children, went to work. His spouse, Mrs. P, stayed in bed with their 18–month–old baby sleeping next to her. A few minutes after SPC P left, Mrs. P heard the front door open. Then she heard someone moving down the hallway towards her bedroom. Mrs. P believed that her husband had returned because he had forgotten his hat. When the person entered her bedroom, she screamed. The person was not her husband. Mrs. P said that the intruder brandished a knife and threatened her son's life unless she stopped screaming.[2] The intruder then raped Mrs. P. By 0537 the attacker had left Mrs. P's quarters. At trial and on appeal, the defense did not contest that Mrs. P had been raped.

Mrs. P called her husband at work at about 0537 and told him she had just been raped. She then called the military police. At about 0545, first the military police and then the U.S. Army Criminal Investigation Command (CID) special agents arrived at SPC P's quarters. Mrs. P described her assailant to CID and at the retrial, as "a [B]lack male, around 5'6" to 5'7" tall, stocky build, around 150 to 160 pounds; he had razor bumps, a big nose . . . . [and] a slight mustache." He was dressed in an Army physical training (PT) uniform with a black wool cap. Mrs. P was unable to see her

---

1. Under the circumstances of this case, Article 63, UCMJ, and Rule for Courts–Martial [hereinafter R.C.M.] 810(d)(1), limited the sentence that could be approved by the convening authority on rehearing to the sentence previously approved after the first trial. *See United States v. Mitchell,*

56 M.J. 936, 938 (Army Ct.Crim.App.), *review granted,* 57 M.J. 489 (2002).

2. On retrial, appellant was acquitted of threatening Mrs. P and her son, and of aggravated assault upon Mrs. P with a knife.

attacker's teeth,[3] nor did she describe any other distinguishing features of the rapist. Appellant is a Black male, 5'5" tall, and weighed 172 pounds. At the time of the rape, he had a slight mustache and an intermittent problem with razor bumps.[4] Neither SPC P nor Mrs. P knew appellant.

While Mrs. P was being raped, she tried to remove her assailant's cap to get a better look at his face. He knocked her hand away, covered her eyes, and told her not to look at him. Thereafter, he told her to roll over onto her front, so her face was in her pillow. He continued to engage in sexual intercourse until he ejaculated. Mrs. P's bedroom was dark; she is near-sighted and was not wearing her glasses during the rape.

Prior to the first trial, Mrs. P was unable to identify her attacker from a physical line-up (which did not include appellant)[5] and from a subsequent photo line-up conducted approximately three months after the rape (which included a poor-quality Polaroid photograph of appellant). At the original trial, Mrs. P was asked, "Now, do you know the accused in this case, and he's sitting between [appellant's civilian and military defense counsel]." She responded "no." At the conclusion of the merits testimony during the original trial, the trial judge instructed the members, "[Mrs. P] has been unable to identify any specific person as her attacker in physical or photographic lineups. During her testimony to this court-martial, she was unable to identify the accused as her attacker."

At the rehearing, Mrs. P testified that in the original trial, before being called as a

witness, she saw appellant in the courtroom hallway and recognized him as her attacker. He was wearing his Class A uniform, including his name tag. Mrs. P recognized appellant before she saw his name tag. She told no one except her husband (who was with her at the time), because after recognizing appellant no one asked her to identify him as the perpetrator and she was scared. At the rehearing, Mrs. P also explained that when she testified in the original trial that she did not "know" appellant, she meant she did not know appellant socially and did not work with him. At the rehearing, Mrs. P made an in-court identification of appellant as the man who raped her, without objection from trial defense counsel.

Lieutenant Colonel Garra testified that he overheard Mrs. P tell her husband in a coffee lounge during the first trial that she could not recognize appellant as her attacker. Inmate Brown, who was a neighbor of the P's, said that in 1997 Mrs. P told him that she did not believe the person in jail was her attacker.

### Serology and DNA Evidence

Mrs. P's vagina was swabbed as part of the rape kit procedure and the swabs and her panties were sent to the USACIL for testing.[6] At USACIL, lab personnel found semen on Mrs. P's panties and on the vaginal swabs. Testing revealed that the rapist had blood-type B, which matched appellant's blood type. Blood-type B is shared by approximate 19% of the total Black population. Specialist P and three other possible suspects did not have blood-type B.

3. Appellant had a prominent gold front tooth.

4. When appellant first became a suspect, two months after the rape, a CID investigator noticed razor bumps on appellant's chin. Appellant also had a shaving profile while incarcerated, two years after the rape. An inmate at the United States Disciplinary Barracks (Inmate Brown), appellant's unit commander at the time of his first trial (Lieutenant Colonel (LTC) Garra), appellant's wife, and another noncommissioned officer who served with appellant at Fort Riley in 1995 testified that they had never seen razor bumps on appellant's face. A dermatologist examined appellant shortly before the retrial and opined that appellant did not currently suffer

from razor bumps and that his skin was not scarred by recurrent previous episodes of razor bumps.

5. During the physical lineup she stated that one Black male in the lineup looked familiar. This Black male was a family friend and Mrs. P told CID that he was not her attacker. Nonetheless, CID sent his blood sample to the CID Laboratory (USACIL) for comparison with the semen from the rape. This Black male's blood type did not match the rapist's blood type.

6. Ms. P kept her panties on during the rape and wore them to the hospital where the rape kit procedure was conducted.

Mr. Auvdel, an expert in DNA analysis who was employed at USACIL, conducted the DNA tests in this case. He used Restriction Fragment Length Polymorphism (RFLP) DNA analysis [7] and Federal Bureau of Investigation (FBI) "match criteria" [8] to compare the five chromosome loci in the semen from Mrs. P's vaginal swabs and panties to five chromosome loci from appellant's DNA. The National Research Council (NRC) [9] guidelines were used to establish the DNA testing procedures at USACIL. Utilizing the FBI database for statistical analysis and applying the "product rule," Mr. Auvdel and Dr. Basten, an expert witness in popula-

tion genetics and statistics, testified that the chances of another Black being the source of the semen from Mrs. P's swabs and panties was 1 in 240 billion.[10] Dr. Basten elaborated that if the possibility of population substructures was taken into account,[11] that is, the possibility of a slightly higher level of relatedness in certain racial groups or parts of a population, such as Blacks in the United States, then the probability of some unrelated individual other than appellant being the source of the semen changed from 1 in 240 billion to 1 in 2.9 billion.

Trial defense counsel thoroughly cross-examined Mr. Auvdel regarding USACIL DNA

7. "RFLP analysis is a widely-accepted and scientifically validated method of forensic DNA testing, which has never been rejected as unreliable in any state or federal court." *United States v. Lowe*, 954 F.Supp. 401, 405 (D.Mass.1996) (citation omitted); *see also, e.g., United States v. Davis*, 40 F.3d 1069, 1074–75 (10th Cir.1994) (stating that statistical probabilities are basic to DNA analysis and have been widely researched and discussed); *United States v. Chischilly*, 30 F.3d 1144, 1152–58 (9th Cir.1994) (discussing admission of RFLP DNA evidence); *United States v. Bonds*, 12 F.3d 540, 549–68 (6th Cir.1993) (noting in RFLP DNA case that a majority of courts have admitted DNA testimony and evidence as generally accepted); *United States v. Martinez*, 3 F.3d 1191, 1193–99 (8th Cir.1993) (noting in RFLP DNA case that theory underlying DNA typing is well-accepted).

8. The use of FBI match criteria involves a visual assessment and computer measurements. This process is discussed in detail in *United States v. Peters*, No. CR 91–395–SC, 1995 U.S. Dist. LEXIS 20950, at *27–29 (D.N.M. Sept. 7, 1995), *aff'd*, 133 F.3d 933 (10th Cir.1998) (unpub.).

9. The NRC, the principal operating agency of the National Academy of Sciences and the National Academy of Engineering, produced reports in 1992 and 1996 about DNA technology in forensic sciences. *See* NATIONAL RESEARCH COUNCIL, THE EVALUATION OF FORENSIC DNA EVIDENCE [hereinafter NRC Report] v, viii (1996), *available at http://books.nap. edu/books/0309053951/html/*. Throughout the trial and on appeal the parties cited extensively to the 1992 and 1996 NRC Reports.

10. The product rule assumes that there is "random mating in the population that forms the database." *Peters*, 1995 U.S. Dist. LEXIS 20950, at *76; *see Lowe*, 954 F.Supp. at 407; *Government of the Virgin Islands v. Byers*, 941 F.Supp. 513, 520–21 (D.Vi.1996). The defense contended through cross-examination at the retrial, and thereafter on appeal, that the FBI DNA database was not randomly selected, or that the Blacks in

the database might not really have been Black (Defense Appellate Brief at 14 (citing *People v. Watson*, 257 Ill.App.3d 915, 196 Ill.Dec. 89, 629 N.E.2d 634 (1st Dist.Ill.1994))).

11. This statistical determination is known either as the "modified ceiling principal," or the "ceiling principal" and is discussed in detail in *Peters*, 1995 U.S. Dist. LEXIS 20950, at *87–97 (discussing difference between modified ceiling principal and ceiling principal and noting that modified ceiling principal is conservative, but scientifically valid). *See also Lowe*, 954 F.Supp. at 407–08; *Byers*, 941 F.Supp. at 521–22. On cross-examination, Mr. Auvdel stated that if three rather than five chromosome loci were compared (three chromosomes were compared prior to appellant's first trial), and if the ceiling principal calculation were used, the probability of a match decreased to 1 in 70,080. The NRC recommends use of the product rule where the race of the suspect is known. 1996 NRC Report, at 5. Results after application of the product rule have been widely admitted in federal trials involving DNA evidence. *See* 1996 NRC Report, at 205 app. 6A; *Byers*, 941 F.Supp. at 522. Prior to 1996 some courts required use of the modified ceiling principle or the ceiling principal rather than the product rule for determining DNA statistics. *See, e.g., State v. Streich*, 163 Vt. 331, 345, 658 A.2d 38 (Vt.1995) (ceiling principle statistics required to fully protect rights of criminal defendants under current state of scientific development); *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152, 1190 (1993) (statistical evidence of random match probabilities held inadmissible); *Commonwealth v. Lanigan*, 419 Mass. 15, 641 N.E.2d 1342, 1349–50 (1994) (use of ceiling principle did not result in disadvantage to defendant); *State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483, 493–95 (1992) (use of product rule to estimate population frequencies was error); *see also United States v. Goode*, 54 M.J. 836, 851–52 (N.M.Ct.Crim.App.2001) (noting that the trial judge admitted DNA statistics based on the modified ceiling principal over the product rule).

testing procedures. Mr. Auvdel agreed that the 1992 NRC Report indicated that forensic DNA testing is not infallible, and that "[l]aboratory errors happen, even in the best laboratories, and even when the analyst is certain that every precaution against error was taken." Mr. Auvdel explained that a "match" means only that the observation "falls within [ ] certain criteria, plus or minus 2.5 percent . . . ." He further explained that DNA analysis does not compare the actual size of DNA bands, but relies on approximations that "fall into a certain range" of plus or minus 2.5 percent. There are six primary steps in DNA analysis, and each primary step is comprised of numerous lesser steps. Risk of cross-contamination requires care to avoid mixing up samples. Mr. Auvdel defended USACIL and FBI use of ethidium bromide, even though the 1992 NRC Report recommended against its use.[12]

Mr. Auvdel said he knew of the case in England where there was a reported "match" in a DNA test of six chromosome loci, but later testing of additional loci showed the samples did not actually match.[13] Many labs, including USACIL, are now going to PCR testing, which tests more loci. Mr. Auvdel agreed with the 1992 NRC Report's conclusion that blind proficiency testing is superior to open proficiency testing. Mr. Auvdel had conducted "at least two blind proficiency tests." He could not say, however, whether a blind proficiency test had been made in USACIL's DNA section the previous year.

Mr. Auvdel testified that USACIL did not have a DNA error rate.[14]

During Mr. Auvdel's cross-examination the following exchange occurred:

Q. Now, the NRC discusses that perhaps one way of quality assurance would be a second lab test,[15] send the samples to a second lab, correct?

A. Yes, sir.

Q. Obviously you don't do that at USACIL?

A. No, sir.

Q. But would you agree that if that was done, that that might increase the confidence in the level of the testing if there were similar results?

A. I believe so, sir, yes.

During Mr. Auvdel's redirect examination, trial counsel asked whether samples remained of Mrs. P's vaginal swabs and panties for additional or independent testing. Mr. Auvdel responded, "yes." The trial counsel then asked whether there had been a request for additional testing by either party. Trial defense counsel objected, arguing that this question was outside the scope of cross-examination and an improper attempt to shift the burden of proof to the defense in violation of appellant's constitutional rights. Trial counsel countered that the defense had "opened the door" to this question by asking Mr. Auvdel if the 1996 NRC Report, which had made recommendations about lab procedures and quality assurance, was in place in

12. In *Peters*, 1995 U.S. Dist. LEXIS 20950, at *45–61, the court discusses in detail the FBI's use of ethidium bromide and the concern about band shifting, concluding that the FBI's "treatment of samples in which band shifting has occurred is both scientifically valid and reliable." *Id.* at *60.

13. Mr. Auvdel stated that the RFLP test uses different chromosomes, different technology, and a different database than the English example that used the Polymerase Chain Reaction (PCR) test. RFLP and PCR each have advantages and disadvantages. For example, it may be necessary to test more loci for PCR than RFLP in order to produce the same amount of information about the likelihood that two samples are a match. *See* George B. Smith & Janet A. Gordon, *The Admission of DNA Evidence in State and Federal Courts*, 65 FORDHAM L. REV. 2465, 2471 (1997) (citing 1996 NRC Report, at 71).

14. In *Bonds*, 12 F.3d at 560, the court noted, "The deficiencies in calculating the rate of error and the failure [of the FBI DNA laboratory] to conduct external blind proficiency tests are troubling," and the lack of evidence of a "rate of error is a negative factor in the analysis of whether the FBI's procedures are scientifically valid." However, these concerns went to the weight of the evidence, not its admissibility. *Id.* at 561; *see Lowe*, 954 F.Supp. at 414–16 (indicating no absolute requirement for blind external proficiency tests).

15. The 1996 NRC Report states at page 4, "No amount of effort and improved technology can reduce the error rate to zero, and the best protection a wrongly implicated, innocent person has is the opportunity for an independent retest."

the lab when appellant's DNA samples were tested in 1995. Trial counsel argued, "There's a clear implication here that had the test been re-done under the new [1996] standards, that there may have been a different result." The military judge overruled the defense objections and permitted Mr. Auvdel to respond that no one had requested a re-test.

Trial defense counsel did not request, nor did the military judge offer to the defense or provide to the members, a limiting instruction. In closing arguments, while trial defense counsel argued that additional testing might exonerate appellant, trial counsel did not mention the possibility of a retest and conceded that the burden of proof rested with the government. At the conclusion of the merits portion of the trial, the military judge instructed the members that the burden of proof remains with the government.

### Discussion

In this appeal appellant reasserts a claim made at trial-that when the military judge allowed Mr. Auvdel to testify that no one had requested a DNA retest, the burden of proof effectively shifted from the government to the defense. The government contends that the assignment of error is without merit for three reasons: (1) there was no error; (2) any alleged error was "invited" by trial defense counsel;[16] and (3) even if there was error, it was harmless because of the military judge's subsequent instructions. We agree

with the second and third government arguments; we need not address the first.[17]

■■■ The government has the burden of proving that appellant is guilty of each element of the crime beyond a reasonable doubt. UCMJ art. 51(c)(4), 10 U.S.C. § 851(c)(4); *United States v. Czekala*, 42 M.J. 168, 170 (1995) (citing *In re Winship*, 397 U.S. 358, 363-64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). A trial counsel may not comment, directly or otherwise, that an appellant did not testify in his own defense.[18] " 'But where ... the prosecutor's reference to the defendant's opportunity to testify is a **fair response** to a claim made by defendant or his counsel, we think there is no violation of the privilege.' " *Stadler*, 47 M.J. at 212 (Crawford, J., concurring in the result) (alteration in original) (quoting *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988)). " 'It is well established that the government may comment on the failure of a defendant to refute government evidence or to support his own claims.' "[19]

■■■ While not every comment from a trial counsel about an accused's failure to testify in his own defense is a constitutional violation, in our analysis we look to the context of the facts in each case,[20] and remain vigilant to the fact that appellant had no obligation to request a retest. *See* UCMJ art. 51(c)(4); *Czekala*, 42 M.J. at 170. We hold that trial

---

**16.** *See United States v. Raya*, 45 M.J. 251, 254 (1996) ("Appellant cannot create error and then take advantage of a situation of his own making."); *United States v. Dinges*, 55 M.J. 308, 311 (2001) (doctrine of invited error precludes relief).

**17.** Evidence that the defense did not request a DNA retest could have resulted in speculation that no such retest was requested because appellant knew he was guilty. *See United States v. Stadler*, 47 M.J. 206, 213 (1997) (Crawford, J., concurring in the result) (discussing "conflicting inferences" resulting from accused's cross-examination about failure to contact exculpatory witness); *Greer v. Mitchell*, 264 F.3d 663, 683 (6th Cir.2001), *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002) (prosecution made ill-advised remark when he argued that appellant offered no expert testimony to refute the state's expert witness, but remark not so flagrant as to require reversal). *But see United States v. Taylor*, 47 M.J. 322, 324 (1997) ("This Court generally has not permitted a trial counsel to comment on

the failure of the defense to produce evidence." (citations omitted)); *Hayes v. State*, 660 So.2d 257, 265 (Fla.1995) (allowing prosecutor to ask if defense had requested testing of blood stains and prosecutor's argument regarding the adverse inference to be drawn from appellant's failure to test hair samples resulted in reversible error).

**18.** *United States v. Gilley*, 56 M.J. 113, 120 (2001) (citing *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)) (other citations omitted); *United States v. Mobley*, 31 M.J. 273, 279 (C.M.A.1990) (citing *Griffin*).

**19.** *Stadler*, 47 M.J. at 214 (Gierke, J., concurring in the result) (quoting *United States v. Webb*, 38 M.J. 62, 66 (C.M.A.1993), and *United States v. Coven*, 662 F.2d 162, 171 (2d Cir.1981)).

**20.** *See Webb*, 38 M.J. at 65 (citing *Robinson*, 485 U.S. at 32, 108 S.Ct. 864) (other citation omitted).

defense counsel's cross-examination of Dr. Auvdel opened the door for trial counsel's question about DNA retesting by raising the issue of whether further testing of the available DNA material from the rape could have exonerated appellant. We find that trial counsel's question asking if anyone had requested a retest was a "fair response" to trial defense counsel's implication. *See Gilley*, 56 M.J. at 120 (citing *Robinson*, 485 U.S. at 32, 108 S.Ct. 864) (other citations omitted).

■ Assuming *arguendo*, that Mr. Auvdel's response raised an improper inference relating to appellant's right not to testify[21] or shifted the burden of proof, we find that any error was harmless beyond a reasonable doubt. *See Gilley*, 56 M.J. at 120; *Mobley*, 31 M.J. at 279 (both citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). At the close of all evidence the military judge correctly instructed the members as follows: "[T]he burden of proof to establish the guilt of the accused beyond a reasonable doubt is on the government. The burden never shifts to the accused to establish his innocence or to disprove those facts which are necessary to establish each element of any particular offense." While it would have been better if the military judge had offered the defense counsel an opportunity to request an immediate instruction, such as " 'the accused has no duty to produce any evidence in this courtroom .... you must make sure you do not try to shift the burden to the accused to prove his innocence;

that [burden] always rests upon the prosecution[,]' "[22] such an offer is not required.[23] The instructions to the members immediately before deliberations rendered any error harmless. *Stadler*, 47 M.J. at 208 (subsequent instructions cured any error arising from improper cross-examination questions concerning appellant's failure to contact witnesses who could have exonerated him). We presume that the members followed the military judge's instruction. *See United States v. Taylor*, 53 M.J. 195, 198 (2000) (citations omitted); *United States v. Barron*, 52 M.J. 1, 5 (1999) (citing *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A.1990)).

### Harmless Error and Factual Sufficiency

■ Absent trial counsel's question about DNA retesting, it is also clear beyond a reasonable doubt that the panel would have returned a guilty verdict. *See United States v. Hasting*, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (citation omitted). Moreover, we are independently convinced beyond a reasonable doubt that appellant is guilty. *See* UCMJ art. 66(c); *United States v. Washington*, 57 M.J. 394, 399–400 (2002); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

Appellant's other six primary arguments in support of his claim of factual insufficiency are weak: (1) the timing and circumstances of the rape indicated advance planning, but appellant lacked an opportunity to plan the rape;[24] (2) the real rapist seemed to be

21. Appellant did not testify. The defense counsel did not object to the military judge's proposal to give an instruction from the Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Bench-book [hereinafter Benchbook], para. 7–12 (30 Sept. 1996), pertaining to the accused's failure to testify. Thereafter, the military judge instructed the members before findings deliberations, "[T]he accused has an absolute right to remain silent and you will not and must not draw any inference adverse to the accused from the fact he did not testify as a witness. In other words, the fact that the accused has not testified must be disregarded by you."

22. In *Stadler*, 47 M.J. at 208, our superior court endorsed the trial judge's decision to immediately provide this curative instruction. *See also State v. Gentry*, 125 Wash.2d 570, 888 P.2d 1105, 1121–1122 (1995), *quoted in* 1996 NRC Report, at 183 n.52 ("While it is questionable whether

asking scientific experts whether they did, or could have, conducted duplicate testing is error at all, in this case any possible error in confusing the jury as to the burden of proof was cured by the trial court's simultaneous curative instructions." (citations omitted)), *amended by* 137 Wash.2d 378, 972 P.2d 1250 (1999); *White v. State*, 934 S.W.2d 891, 895 (Tex.Ct.App.1996) (noting curative effect of immediate instruction by trial court regarding comment of prosecutor).

23. *Stadler*, 47 M.J. at 213 (Crawford, J., concurring in the result) (trial judge has no *sua sponte* duty to suggest a limiting instruction).

24. Planning was demonstrated when the perpetrator apparently knew just when to enter Mrs. P's quarters, brought a knife, and wore Nomex gloves. Appellant and his family lived off post the year prior to the rape. Appellant returned to Fort Riley only six days before the rape, after

familiar with the P quarters, however, there was no evidence that appellant had such familiarity;[25] (3) appellant's fertility[26] was inconsistent with the lack of motile sperm found during Mrs. P's rape kit examination shortly after the rape;[27] (4) the rape and burglary are inconsistent with appellant's good military character, as attested to by two noncommissioned officers; (5) appellant's schedule the morning of the rape made it very difficult for appellant to have committed the crimes;[28] and (6) the real rapist removed one of his gloves during the rape,[29] a latent fingerprint of unknown origin (not matching appellant) was found on the inside of the doorknob to the front door of the P residence, and this fingerprint might belong to the real rapist.[30]

Mrs. P described her rapist as a stocky black male, about 5'6" to 5'7" tall, weighing 150 to 160 pounds, with a large nose, and razor bumps; appellant substantially met this description. Appellant had been issued the same type of glove as that left behind by the rapist. Most importantly, the blood type and the DNA from the semen taken from Mrs. P and her panties matched appellant's blood type and DNA. We are persuaded that appellant's guilt was proven beyond a reasonable doubt.

All remaining assignments of error are without merit. We find no material prejudice to the substantial rights of appellant. *See* UCMJ art. 59(a), 10 U.S.C. § 859(a).

The findings of guilty and the sentence are affirmed

Senior Judge CANNER and Judge BARTO concur.

completing a one-month temporary duty (TDY) at Fort Irwin. While appellant was TDY his wife moved the family into quarters on Fort Riley, approximately two-tenths of a mile from the P quarters. Appellate defense counsel assert that appellant had insufficient time to learn enough about his new neighborhood to be comfortable committing a rape there, or to learn that SPC P had been going to work at about 0530 instead of 0600 each morning for about a week.

25. Mrs. P testified that she did not hear the rapist bump or trip over anything as he walked towards her bedroom, even though there were household items on the floor and an ironing board in the hallway between the front door and the master bedroom. Appellant's quarters on Fort Riley have a different floor plan than the P quarters and there was no evidence presented at trial that appellant was familiar with the floor plan of the P quarters.

26. Appellant has three children, the last being born nineteen months after the rape.

27. Dr. Welch, an emergency physician, collected a rape kit on Mrs. P about two hours after the rape. He testified that the sperm collected from Mrs. P were non-motile and he, therefore, believed that the perpetrator of the rape was infertile. In rebuttal, Dr. Beyer–Nolen, an obstetrics/gynecology physician, listed a variety of factors that could negatively impact the motility or fertility of sperm deposited by a fertile person: (a) the acidic nature of the vagina; (b) drug use; and (c) heat, such as using a hot tub. Accordingly, no conclusions about fertility can be made based upon a single examination of sperm taken from a vagina as part of a rape kit procedure.

28. The platoon sergeants of appellant's unit, dressed in Army PT uniforms, routinely met with the First Sergeant at 0600. Appellant, as a platoon sergeant, was expected to attend this meeting. One defense witness stated that appellant's normal routine was to be at work by about 0545. He could not say with certainty, however, where appellant was on the morning of the rape. In any event, even if appellant had reported to work at 0545, he still had enough time to commit the rape between 0529 and 0537 because of the close proximity of the P quarters to appellant's unit. It was eight-tenths of a mile from SPC P's quarters to appellant's unit. The defense did not request, nor did the military judge offer to the defense or provide to the members, an alibi instruction. *See* Benchbook, para. 5–13.

29. CID found a right-handed Nomex glove in SPC P's bedroom after the rape. Appellant was issued Nomex gloves upon his arrival at Fort Riley and turned in a complete pair of Nomex gloves when he was reassigned to Fort Bragg shortly after the rape. Nomex gloves are available at military surplus stores in the vicinity of Fort Riley.

30. The military police arrived at the P quarters before CID and secured the crime scene. There was no evidence about whether the military police or any other recent visitor to the P quarters might have left the fingerprint on the doorknob.