UNITED STATES, Appellee

v.

Arthur MASON, Jr., Staff Sergeant
U.S. Army, Appellant

No. 03-0259

Crim. App. No. 9601811

United States Court of Appeals for the Armed Forces

Argued    March 3, 2004
Decided   May 4, 2004

CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE, EFFRON, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant: Captain Kathy Martin (argued); Colonel Robert D. Teetsel, Lieutenant Colonel Mark Tellitocci, and Major Allyson G. Lambert (on brief); Lieutenant Colonel E. Allen Chandler, Jr., Major Jeanette K. Stone, and Captain Linda A. Chapman.

For Appellee: Captain Ryan R. McKinstry (argued); Colonel Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines, and Captain Mark A. Visger (on brief); Captain Tami L. Dillahunt.

Amicus Curiae for Appellee: Marc A. DeSimone, Jr. (law student) (argued); Susan J. Hankin, Esq. (supervising attorney) and Michael Haslup (law student) (on brief) – for the University of Maryland School of Law.

Military Judges: G. O. Varo (first trial); R. F. Holland (retrial).

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**.

Chief Judge CRAWFORD delivered the opinion of the Court.

On November 2, 1996, a general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of rape, aggravated assault with a dangerous weapon, burglary, and communication of a threat, in violation of Articles 120, 128, 129, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 920, 928, 929, and 934 (2000). The convening authority approved the adjudged sentence to a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, and reduction to pay-grade E-1.

On June 30, 1999, the Army Court of Criminal Appeals set aside the findings and sentence for Appellant's first trial based on an improper ruling by the military judge on a defense challenge for cause against a member. United States v. Mason, Army No. 9601811 (A. Ct. Crim. App. 1999). A rehearing was authorized.

On March 31, 2000, Appellant was retried by a general court-martial composed of officer and enlisted members and, contrary to his pleas, was found guilty of rape and burglary, in violation of Articles 128 and 129. The members sentenced Appellant to a dishonorable discharge, ten years of confinement, total forfeitures, and reduction to pay grade E-1. The convening authority approved only so much of the sentence as

provided for a dishonorable discharge, eight years of confinement, total forfeitures, and reduction to E-1, and credited him with 922 days of confinement.

On January 27, 2003, the Army Court affirmed the findings and sentence. United States v. Mason, 58 M.J. 521 (A. Ct. Crim. App. 2003). On September 30, 2003, this Court granted review of the following issues:[1]

  I.   WHETHER THE MILITARY JUDGE ERRED IN DENYING THE
       DEFENSE MOTION TO SUPPRESS BLOOD TEST RESULTS AND
       RELATED DNA EVIDENCE.  (A) WAS THERE A BASIS FOR
       CONCLUDING THAT PROBABLE CAUSE EXISTED? (B) DID
       THE AGENTS PROVIDE FALSE AND MISLEADING
       INFORMATION AND OMIT MATERIAL FACTS WHEN SEEKING
       THE WARRANT THAT WAS ISSUED TO OBTAIN A SAMPLE OF
       APPELLANT'S BLOOD?

  II.  WHETHER THE MILITARY JUDGE ERRED IN OVERRULING
       THE DEFENSE OBJECTION TO THE GOVERNMENT'S
       QUESTION TO ITS DNA EXPERT REGARDING WHETHER THE
       DEFENSE HAD REQUESTED THE EVIDENCE BE RETESTED.
       DID THIS QUESTION IMPROPERLY SHIFT THE BURDEN TO
       THE DEFENSE TO PROVE APPELLANT'S INNOCENCE?

  III. WHETHER THE ARMY COURT ERRED BY HOLDING THAT THE
       DEFENSE HAD OPENED THE DOOR FOR THE GOVERNMENT'S
       QUESTION ABOUT DNA RETESTING BY RAISING THE ISSUE
       OF WHETHER FURTHER TESTING OF THE AVAILABLE DNA
       MATERIAL FROM THE RAPE COULD HAVE EXONERATED
       APPELLANT.

---

[1] We heard oral argument in this case at the University of Maryland School of Law, Baltimore, Maryland, as part of the Court's "Project Outreach." This practice was developed as part of a public awareness program to demonstrate the operation of a Federal Court of Appeals and the quality of the military criminal justice system.

For the reasons set forth below, we affirm the findings and sentence.

## FACTS

The Army Court of Criminal Appeals summarized the preliminary facts of the case as follows:

> At 0529 [on March 10, 1995,] Specialist (SPC) P, who lived in quarters on Fort Riley with his wife and two children, went to work. His spouse, Mrs. P, stayed in bed with their 18-month-old baby sleeping next to her. A few minutes after SPC P left, Mrs. P heard the front door open. Then she heard someone moving down the hallway towards her bedroom. Mrs. P believed that her husband had returned because he had forgotten his hat. When the person entered her bedroom, she screamed. The person was not her husband. Mrs. P said that the intruder brandished a knife and threatened her son's life unless she stopped screaming. The intruder then raped Mrs. P. By 0537 the attacker had left Mrs. P's quarters. At trial and on appeal, the defense did not contest that Mrs. P had been raped.

> Mrs. P called her husband at work at about 0537 and told him she had just been raped. She then called the military police. At about 0545, first the military police and then the U.S. Army Criminal Investigation Command (CID) special agents arrived at SPC P's quarters. Mrs. P described her assailant to CID and at the retrial, as "a [B]lack [sic] male, around 5'6" to 5'7" tall, stocky build, around 150 to 160 pounds; he had razor bumps, a big nose. . . . [and] a slight mustache." He was dressed in an Army physical training (PT) uniform with a black wool cap. Mrs. P was unable to see her attacker's teeth, nor did she describe any other distinguishing features of the rapist. Appellant is a Black [sic] male, 5'5" tall, and weighed 172 pounds. At the time of the rape, he had a slight mustache and an intermittent problem with razor bumps. Neither SPC P nor Mrs. P knew appellant.

> While Mrs. P was being raped, she tried to remove her assailant's cap to get a better look at his face.

4

> He knocked her hand away, covered her eyes, and told her not to look at him. Thereafter, he told her to roll over onto her front, so her face was in her pillow. He continued to engage in sexual intercourse until he ejaculated. Mrs. P's bedroom was dark; she is near-sighted and was not wearing her glasses during the rape.
>
> . . . .
>
> Mrs. P's vagina was swabbed as part of the rape kit procedure and the swabs and her panties were sent to the [United States Army Criminal Investigation Laboratory (USACIL)] for testing. At USACIL, lab personnel found semen on Mrs. P's panties and on the vaginal swabs. Testing revealed that the rapist had blood-type B, which matched appellant's blood type. Blood-type B is shared by approximate 19% of the total Black [sic] population. Specialist P and three other possible suspects did not have blood-type B.

Id. at 522-23 (footnotes omitted).

Mrs. P was presented with several line-ups as an opportunity to identify her assailant. During a physical line-up which did not include Appellant, Mrs. P identified an individual, whom she knew socially, as closely resembling her rapist. Mrs. P noted that the individual was not actually the rapist. Mrs. P was also shown Appellant's picture in a photographic line-up, but did not identify him as the rapist.

Nearly two months after the rape, early on the morning of May 5, 1995, a vehicle was seen leaving the Fort Riley Child Development Center (CDC), reportedly carrying a black male who had acted suspiciously in the CDC parking lot on an earlier occasion. Appellant was identified as the owner of that

vehicle. CDC staff noted the incident because they were on alert for suspicious behavior due to some recent purse snatchings from parked vehicles.

In August, a military police investigator reported to the CID that Appellant matched the assailant's description provided by Mrs. P. The CID subsequently obtained a search authorization from a military magistrate to seize a sample of Appellant's blood. The sample was sent to the crime laboratory, which matched Appellant's blood to the semen evidence obtained from Mrs. P. As a result of the match, Appellant was charged with the crimes against Mrs. P.

### DISCUSSION

I. The Military Judge did not Err in Denying the Defense Motion to Suppress Blood Test Results and Related DNA Evidence

The search authorization for Appellant's blood sample was issued by Captain Oclander at Fort Bragg, North Carolina, following Appellant's reassignment to that post. Captain Oclander was appointed to be a part-time magistrate shortly after she arrived on post as a judge advocate. The authorization was based on information provided to Captain Oclander by CID agent Eric Bruce, who submitted an affidavit and made an oral statement to Captain Oclander to support his search authorization request. The information he provided to Captain Oclander included the following key points:

- Appellant was identified as the owner of a car that was hastily driven away from the Child Development Center on Fort Riley, after the driver was questioned by the Military Police about recent purse snatchings.

- Appellant was a stocky, black male between five foot four and five foot six, and therefore matched the general description of the rapist provided by Mrs. P.

- Appellant's military specialty required that he be issued Nomex gloves, and a Nomex glove had been left by the assailant at the rape scene.

- Appellant lived on post approximately one to two blocks from where the rape victim lived.

- Appellant had type B blood, which was the blood type of the person who left semen in Mrs. P.

Agent Bruce based his affidavit and request in part on information he obtained from a CID agent assigned to the case. At trial, Captain Oclander was asked which specific facts were important to her when she issued the search authorization. She responded:

> The description was important, the Nomex glove was important, the location of his residence in relation to the victim's residence, the blood type in relation to the assailant's blood type, and the fact that because of his being seen at the Child Development Center on several occasions would have given him perhaps an opportunity to have been at the scene that day.

7

Appellant moved at trial to suppress his blood sample from evidence, arguing that the authorization issued to obtain the sample was invalid because the magistrate lacked probable cause to issue the authorization, and the CID omitted material exculpatory information from the affidavit presented to the magistrate in support of the authorization. The judge denied Appellant's motion to suppress, concluding as follows:

> Assessing all of these things from the perspective of whether there's probable cause, with all of these clarifications and amplifications that the defense complains were left out of the information provided, is not only sufficient, in my judgment to provide probable cause, but it is more than a basis for reasonable belief that if Staff Sergeant Mason was examined, evidence might be obtained.

> Further, as the 11th Circuit formulation cited by the defense, it provides more than a fair possibility of finding such evidence by a search of Staff Sergeant Mason's person for blood samples or other bodily fluids. That's not to say that it rises to the level of being clear and convincing evidence of his guilt, but that is not the standard for judging this.

> The approach that I've just used is taken by extension from M.R.E. 311(g)(2), but it is also taken from the case cited by the defense, which is included in the record as an appellate exhibit from yesterday's session, State of South Carolina versus Missouri, where the court excluded the false information and inserted the exculpatory information and evaluated whether, taken in that light, there remained a substantial basis upon which the Magistrate could have found probable cause to issue the warrant. Applying that analysis, I don't believe that there's any reason that probable cause cannot be found within this information. And my conclusion of law is that there was probable cause. Accordingly, the defense motion to suppress is denied.

United States v. Mason, No. 03-0259/AR

This Court now reviews for an abuse of discretion the military judge's decision to admit the blood sample into evidence. United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995). We hold, first, that the magistrate had probable cause to issue the search authorization for Appellant's blood, and, second, that Appellant has failed to meet his substantial burden under Franks v. Delaware, 438 U.S. 154 (1978), to show that the information allegedly omitted from the CID affidavit would have extinguished probable cause had that information been included. Consequently, the military judge did not abuse his discretion in denying Appellant's motion to suppress.

A. The Magistrate had Probable Cause to Issue the Search Authorization for Appellant's Blood Sample

Appellant first avers that the information based on which the military magistrate issued the search authorization for Appellant's blood sample was insufficient to establish probable cause. We disagree.

"Nonconsensual extraction of blood from an individual may be made pursuant to a valid search authorization, supported by probable cause." United States v. Carter, 54 M.J. 414, 418 (C.A.A.F. 2001)(citing Military Rule of Evidence 312(d) [hereinafter M.R.E.]). M.R.E. 315(f)(2) provides that "[p]robable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located

9

in the place or on the person to be searched." A probable cause determination is precisely

> a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238 (1983)(emphasis added). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

Importantly, "a determination of probable cause by a neutral and detached magistrate is entitled to substantial deference." United States v. Maxwell, 45 M.J. 406, 423 (C.A.A.F. 1996)(quoting United States v. Oloyede, 982 F.2d 133, 138 (4th Cir. 1993)). "[R]esolution of doubtful or marginal cases . . . should be largely determined by the preference . . . [for] warrants. . . . Close calls will be resolved in favor of sustaining the magistrate's decision." United States v. Monroe, 52 M.J. 326, 331 (C.A.A.F. 2000)(quoting Maxwell, 45 M.J. at 423). "A grudging or negative attitude by reviewing courts towards warrants . . . is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." Gates, 462 U.S. at 236 (citations omitted).

10

In reviewing a probable cause determination, courts should consider "the information made known to the authorizing official at the time of his decision . . . [which] must be considered in the light most favorable to the prevailing party." Carter, 54 M.J. at 418 (citations omitted). The magistrate could also consider information known to her personally. M.R.E. 315(f)(2)(C). Thus, the key inquiry is whether all the information presented in the affidavit and orally by CID agent Bruce or known to the magistrate personally, considered cumulatively, was sufficient to show a fair probability that evidence of a crime would be found in the place to be searched – in this case, DNA evidence found in Appellant's blood. "[C]ourts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." United States v. Ventresca, 380 U.S. 102, 109 (1965).

The military magistrate testified that the following evidence influenced her probable cause determination:

> The description was important, the Nomex glove was important, the location of his residence in relation to the victim's residence, the blood type in relation to the assailant's blood type, and the fact that because of his being seen at the Child Development Center on several occasions would have given him perhaps an opportunity to have been at the scene that day.

We agree with the military judge that, in noting the totality of these circumstances and applying her common sense, the

11

magistrate had a substantial basis to conclude that probable cause existed. Indeed, the information based on which the magistrate issued the search authorization, considered cumulatively, supported a reasonable belief that evidence of a crime, in the form of DNA, would likely be found in Appellant – who had the physical features and blood type of the rapist, who was known to have owned gloves similar to those left at the crime scene, who lived near the victim, and who was identified as the owner of a car seen near the crime site at the same time of day as the crime, albeit almost two months later, thus "giv[ing] [Appellant] perhaps an opportunity to have been at the scene that day."

Accordingly, we find no error in the military judge's denial of Appellant's motion to suppress the blood sample on the grounds that probable cause was lacking. United States v. Allen, 53 M.J. 402, 408 (C.A.A.F. 2000)(military judge's findings of fact on probable cause "are binding unless they are clearly erroneous").

B. Appellant has Failed to Demonstrate that the Information Omitted from the Affidavit Would Have Extinguished Probable Cause had it been Included

Appellant also asserts that the CID intentionally or recklessly omitted material information from the affidavit supporting the search authorization, thereby rendering the authorization invalid. We disagree.

M.R.E. 311(g)(2) addresses a motion to exclude evidence obtained from a search authorization which allegedly contained false information.  The rule provides:

> If the defense makes a substantial preliminary showing that a government agent included a false statement knowingly and intentionally or with reckless disregard for the truth in the information presented to the authorizing officer, <u>and if the allegedly false statement is necessary to the finding of probable cause</u>, the defense, upon request, shall be entitled to a hearing.

M.R.E. 311(g)(2) (emphasis added).  "[I]f [the defense shows intentional or reckless disregard], and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  <u>Franks</u>, 438 U.S. at 171-72.  Neither M.R.E. 311(g)(2) nor <u>Franks</u> expressly extends to omissions.  Logically, however, the same rationale extends to material omissions.  "<u>Franks</u> protects against omissions that are <u>designed to mislead</u>, or that are made in <u>reckless disregard of whether they would mislead</u>, the magistrate."  <u>United States v. Colkley</u>, 899 F.2d 297, 301 (4th Cir. 1990).

Importantly, for an accused to receive a hearing, and therefore potential relief, on these grounds, the defense must demonstrate that the omissions were <u>both</u> intentional or reckless, <u>and</u> that their hypothetical inclusion would have

13

prevented a finding of probable cause. United States v. Figueroa, 35 M.J. 54, 56-57 (C.M.A. 1992). Indeed, "[e]ven if a false statement or omission is included in an affidavit, the Fourth Amendment is not violated if the affidavit would still show probable cause after such falsehood or omission is redacted or corrected." United States v. Gallo, 55 M.J. 418, 421 (C.A.A.F. 2001)(quoting Technical Ordnance, Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001))(emphasis added).

Appellant contends that the CID agents intentionally or recklessly withheld the following material, exculpatory evidence:

- During a physical line-up that did not include Appellant, Mrs. P identified another soldier, whom she knew socially, as closely resembling the rapist, though she stated he was not actually the rapist. During a photographic line-up that did include Appellant's picture, Mrs. P was unable to identify the rapist.

- A latent fingerprint lifted from the inside front doorknob at the P's residence did not match Appellant's fingerprints.

- Appellant had a prominent gold front tooth that was missing from Mrs. P's physical description of her attacker.

14

- Appellant had turned in a pair of Nomex gloves when he was reassigned to Fort Bragg.

- Nomex gloves are not unique, are issued to a majority of soldiers at Fort Riley, and are readily available in stores around the Fort Riley area.

- Nearly twenty percent of the black population has type-B blood.

- Appellant had been cleared of any suspicion relating to the CDC incident.

The military judge found that Appellant had not made even a prima facie showing that the omissions were reckless or intentional. Such a determination is a finding of fact that is binding on this Court unless it is shown to be clearly erroneous. United States v. Cravens, 56 M.J. 370, 375 (C.A.A.F. 2002); Allen, 53 M.J. at 408.

We do not find the military judge's determination erroneous. Moreover, for the reasons set forth below, we hold that even if this information had been included in the affidavit, none of it would have prevented a finding of probable cause. Accordingly, the military judge did not err in denying Appellant's motion to suppress the DNA evidence on the grounds that material information was intentionally or recklessly omitted from the affidavit based on which the magistrate made her probable cause determination.

First, the victim was nearsighted and was not wearing her glasses at the time of the rape, which occurred in a dark room by an assailant wearing a cap partially obscuring his face. The victim's inability to identify Appellant in a photographic line-up was consistent with the poor visibility at the time of the rape, and therefore its inclusion on the affidavit would not have extinguished probable cause. These same circumstances mitigate the victim's inability to describe her rapist as having a gold front tooth. As to the latent fingerprint, the fact that another individual at some point in time touched the victim's doorknob has little impact on the likelihood that Appellant might have been in the victim's bedroom. Similarly, that Appellant had turned in a pair of Nomex gloves, and that other servicemembers own Nomex gloves, fails to invalidate the other indicators of Appellant's probable presence in the victim's room, including Mrs. P's physical description of her assailant, the proximity of Appellant's residence to the crime scene, and the match of Appellant's blood type to that of the assailant. As to the CDC incident, the details of the sighting and the lack of any subsequent prosecution for the purse snatchings do not nullify the value of the related information that was included, which located both Appellant's car and a man fitting Appellant's description at a site near the victim's house at the same time of day when the rape occurred, albeit almost two months later.

16

Finally, including the information that only a small percentage of the black population has Appellant's type B blood – a mere 19 percent – would likely have increased probable cause for the search authorization, by diminishing the number of possible suspects. To this end, the information before the magistrate also excluded other material information which would have favored the Government, such as the fact that the CID designated its pool of suspects based on proximity to the crime scene, physical description, and behavior, and that the Government considered four of these suspects before Appellant.

To reiterate the gist of probable cause: "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act[.]'" Gates, 462 U.S. at 241 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949))(emphasis added). The magistrate considered the following factors, in combination, to find probable cause:

- The physical proximity of Appellant's residence to the P residence.

- The match of Appellant's blood type to that of the assailant.

- The Nomex glove found at the crime scene being similar to the gloves issued to Appellant.

- The similarity in times between the rape and the CDC incident.

We acknowledge that agent Bruce should have brought the information about the line-ups to the military magistrate's attention. Nevertheless, we conclude that under the facts of this case, the failure to do so did not invalidate the probable cause determination. Although this is a close case, we are convinced that the cumulative impact of the information before the magistrate was sufficient to yield probable cause that Appellant's blood did contain DNA evidence identifying him as the rapist, and, for the reasons listed above, that the inclusion of the excluded information would <u>not</u> have extinguished this probable cause.

II. <u>The Government's Question to its DNA Expert about Further DNA Testing Constituted Harmless Error which Failed to Prejudice Appellant</u>

During trial, defense counsel cross-examined the Government's DNA expert as follows:

Q: Now, the NRC discusses that perhaps one way of quality assurance would be a second lab test, send the samples to a second lab, correct?

A: Yes, sir.

Q: Obviously, you don't do that at USACIL.

A: No, sir.

Q: But would you agree that if that was done, that that might increase the confidence in the level of testing if there was [sic] similar results?

A: I believe so, sir, yes.

During the redirect examination of the Government's DNA expert, the following exchange took place:

Q: . . . [A]re there samples remaining on the panties of Mrs. [P] and on the vaginal swabs from Mrs. [P] that could be used for additional testing[?]

A: Yes.

Q: Has there been a request by either party?

Defense counsel objected to this question as outside the scope of his cross-examination and as an improper attempt by the Government to shift the burden of proof to the defense. The military judge requested a sidebar conference about the objection, during which trial counsel argued: "There's a clear implication here that had the test been re-done under the new standards, that there may have been a different result." Without explanation, the military judge overruled both objections, and allowed redirect examination of the DNA expert to continue, as follows:

Q: Again, were there any requests by either party to re-test the samples?

A: Not to my knowledge, no.

The Army Court addressed the two objections raised by the defense at trial. The court first concluded that "defense counsel's cross-examination of [the DNA expert] opened the door for trial counsel's question about DNA retesting by raising the

issue of whether further testing of the available DNA material from the rape could have exonerated appellant." Id. at 526-27. The court further concluded that even if trial counsel's question and the expert's response were determined to be error, the military judge's "instructions to the members immediately before deliberations rendered any error harmless." Id. at 527.

Appellant now asserts that the military judge erred in overruling the defense objection when the Government asked the DNA expert if the defense had requested that the evidence be retested, contending that the question improperly sought to shift the burden of proof to the defense. In this regard, Appellant claims the Government improperly suggested to the members that if the accused were innocent, he should have proven so by having the DNA evidence retested. Appellant also asserts that the court below erred by holding that the defense opened the door for the Government's question about DNA retesting by raising the issue of whether further testing of the DNA material could have exonerated him.

Importantly, this is not a case in which the Government sought to counter the defense challenge to the reliability of the test by eliciting testimony as to why an additional test was unnecessary, or to reinforce the 1 in 240 billion chance that someone other was the source of the DNA found at the crime scene.

We hold, first, that the military judge erred in permitting trial counsel's redirect examination of the DNA expert on the issue of whether either party had requested a retest. "The Due Process Clause of the Fifth Amendment to the Constitution requires the Government to prove the defendant's guilt beyond a reasonable doubt." United States v. Czekala, 42 M.J. 168, 170 (C.A.A.F. 1995). Therefore, "[t]he burden of proof to establish the guilt of the accused is upon the Government." Rule for Courts-Martial 920(e)(5)(D). In the case at bar, trial counsel's question to the DNA expert of whether either party had requested a retest suggested that Appellant may have been obligated to request a retest, and therefore obligated to prove his own innocence. In so doing, trial counsel improperly implied that the burden of proof had shifted to Appellant, in violation of due process.

For this Court to affirm despite an error of constitutional dimension, such as this one, the error must be "harmless beyond a reasonable doubt." United States v. Bins, 43 M.J. 79, 86 (C.A.A.F. 1995)(quoting Chapman v. California, 386 U.S. 18, 24 (1967)). The essential question is "what effect the error had or reasonably may be taken to have had upon the [court's] decision." Kotteakos v. United States, 328 U.S. 750, 764 (1946). For the following reasons, we further hold that the military judge's permission of trial counsel's improper redirect

examination of the DNA expert was harmless beyond a reasonable

doubt.  See United States v. Blocker, 32 M.J. 281, 284 (C.M.A.

1991)(noting that in resolving many questions courts may draw

reasonable inferences from the evidence of record).

First, the evidentiary strength of the DNA evidence in this

case was overwhelming.  The expert witness interpreting the DNA

evidence established at trial that the odds of an individual

other than Appellant having been the source of the semen found

in Mrs. P were an extremely small 1 in 240 billion.  The defense

mounted a weak challenge to the DNA evidence, alleging through

cross-examination of the expert witness that the DNA test was

prone to error, and that a second test under new standards could

have increased the accuracy of the results.  The statistical

evidence of the likelihood that Appellant was the source of the

semen found in Mrs. P, and the failure of the defense to

discount this likelihood, rendered the military judge's error in

permitting trial counsel's improper question during redirect

examination of the DNA expert harmless beyond a reasonable

doubt.

Moreover, after closing arguments, the military judge

instructed the members as follows:

> Lastly, the burden of proof to establish the
> guilt of the accused beyond a reasonable doubt is on
> the government.  The burden never shifts to the
> accused to establish his innocence or to disprove

United States v. Mason, No. 03-0259/AR

> those facts which are necessary to establish each
> element of any particular offense.

(Emphasis added.)  See Article 51(c)(4), UCMJ, 10 U.S.C. § 851(c)(4) (2000)(requiring the military judge to instruct the members "that the burden of proof to establish the guilt of the accused beyond a reasonable doubt is upon the United States"); United States v. Clay, 1 C.M.A. 74, 80, 1 C.M.R. 74, 80 (1951)(defining the importance of instructing the members on the proper burden of proof).  These instructions followed trial counsel's own reiteration of the burden of proof during closing argument: "This isn't to say that the government is relieved of the burden beyond a reasonable doubt to prove those elements. The government doesn't suggest that.  The government is burdened by that burden of proof."  As Appellant concedes, at no point during trial other than in the redirect examination of the DNA expert did the Government suggest the burden of proof might have shifted.  Cf. Hayes v. State, 660 So.2d 257, 265-66 (Fla. 1995)(government improperly shifted burden of proof to accused through redirect of crime lab expert on issue of blood stain test raised by defense on cross-exam of expert plus related comments made during government's closing argument).  For these additional reasons, the error was harmless beyond a reasonable doubt.

## DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.