*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————

**UNITED STATES**
Appellee

**v.**

**Kaleb S. GARCIA, Senior Airman**
United States Air Force, Appellant

**No. 20-0262**
Crim. App. No. 2019-07

Argued September 30, 2020—Decided December 9, 2020

Military Judges: Bradley A. Morris and Elizabeth M. Hernandez

For Appellant: *Captain David L. Bosner* (argued); *Captain M. Dedra Campbell* and *Mark C. Bruegger*, Esq.

For Appellee: *Captain Kelsey Shust* (argued); *Colonel Shaun S. Speranza*, *Major Jessica L. Delaney*, and *Mary Ellen Payne*, Esq.

Judge OHLSON delivered the opinion of the Court, in which Judges SPARKS and MAGGS, and Senior Judge EFFRON, joined. Chief Judge STUCKY filed a separate opinion concurring in the result.

———————

Judge OHLSON delivered the opinion of the Court.

It is repugnant to the purpose and principles of the Fourth Amendment for an agent of the government to "knowingly and intentionally, or with reckless disregard for the truth" include in an affidavit false information that is material to a search authorization request, *Franks v. Delaware*, 438 U.S. 154, 155 (1978), or to make material omissions "that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate," *United States v. Mason*, 59 M.J. 416, 422 (C.A.A.F. 2004) (emphasis omitted) (internal quotation marks omitted) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). This proposition should be self-evident. And yet, the Government's troubling conduct in the instant case compels this Court to underscore this essential point from the outset of this opinion.

In this Article 62, Uniform Code of Military Justice (UCMJ),[1] case, the Government has charged Appellant at a general court-martial with one specification of sexual assault of Airman First Class (A1C) JL, in violation of Article 120, UCMJ, 10 U.S.C. § 920 (2018).[2] As explained in detail below, the trial judge[3] on two separate occasions suppressed DNA evidence linking Appellant to this sexual assault. The Government appealed the trial judge's second suppression ruling to the United States Air Force Court of Criminal Appeals (AFCCA) pursuant to the provisions of Article 62, UCMJ. The lower court reversed the trial judge's ruling, holding that she had abused her discretion in suppressing the evidence. We granted review on the following issue: "Whether the Air Force Court of Criminal Appeals erred in finding that the [trial] judge abused her discretion in suppressing evidence obtained as a result of a search and seizure of Appellant's DNA." *United States v. Garcia*, 80 M.J. 278 (C.A.A.F. 2020) (order granting review). Despite the Government's improper conduct in this case, we hold that the trial judge did abuse her discretion in suppressing the evidence from the second search and we therefore affirm the decision of the AFCCA.

## I. Facts

## A. First Suppression Ruling

The relevant charge in this case arose after Appellant, A1C JL, and a third airman engaged in a night of drinking. The trio returned to Appellant's off-base apartment in the early morning hours of February 2, 2019. The following day, A1C JL reported to the Air Force Office of Special Investigations (AFOSI) at Minot Air Force Base, North Dakota, that she had been sexually assaulted by Appellant.[4] Two AFOSI

---

[1] 10 U.S.C. § 862 (2018).

[2] The convening authority also referred two additional specifications of sexual assault of a second airman, A1C ML, for misconduct occurring in August 2018.

[3] Two military judges were involved in this case. For ease of reference, the one who presided at the court-martial will be referred to as "the trial judge," and the one who authorized the second search will be referred to as "the military judge."

[4] The third airman spoke with AFOSI on two occasions about the night in question. In a February 4, 2019, interview, he admitted

agents, Special Agent RB and Special Agent RD, interviewed A1C JL. Special Agent RD then accompanied A1C JL to a local hospital for a sexual assault forensic examination. In the course of her statements to the AFOSI agents and to the sexual assault nurse examiner, A1C JL explained that she was highly intoxicated during the assault, that she could not remember certain aspects of the incident, and that her memory was cloudy about certain other points. Of particular significance to the issue before us, A1C JL gave varying accounts about whether she was clothed when she woke up in bed with Appellant and whether she had any recollection or knowledge of Appellant vaginally penetrating her.

Special Agent RB orally sought a search authorization from the commander of the 91st Security Forces Group to obtain DNA evidence from Appellant, and the commander approved the request. The search being sought was intrusive and included such actions as penile swabbing and pubic combing. Prior to submitting a written search authorization request to the commander, Special Agent RB realized that information she previously had given orally to the commander was inaccurate. Specifically, Special Agent RB had stated unequivocally, but incorrectly, that A1C JL recalled that when she woke up in bed with Appellant, "she wasn't wearing any clothes and neither was he" and that Appellant "was vaginally penetrating her."

Special Agent RB consulted with the Office of the Staff Judge Advocate about this false information in the oral search authorization request. Remarkably, Captain KS told Special Agent RB to keep the incorrect information in the written request because "the affidavit should mirror the facts previously provided" to the commander and did not otherwise instruct her to correct this misinformation. Accordingly, Special Agent RB provided an inaccurate affidavit, which stated that the victim's "next memory was waking up without any clothes on in [Appellant's] spare bedroom," and Appellant was "on top

---

to engaging in sexual intercourse with A1C JL and consented to a search and seizure of his DNA. In a February 7 follow-up interview, the third airman further indicated that Appellant wanted to engage in a threesome with A1C JL and that Appellant had been alone with A1C JL for approximately ten to twenty minutes.

of [the victim] penetrating her vaginally." Despite this false information in the affidavit, Special Agent RB took an oath attesting to its veracity. Moreover, neither Special Agent RB nor Captain KS informed the commander through other means that the search authorization request contained information they knew to be false.

Prior to trial, the defense filed a motion to suppress the DNA results revealing that A1C JL's vaginal swabs contained Appellant's DNA, and that Appellant's penile swabs contained the DNA of A1C JL. The trial judge granted the motion, essentially concluding that the Government's intentional and reckless action of including false information in the search authorization request warranted suppression of the evidence. She found that "SA [RB's] conduct in providing materially false statements to the search authority, coupled with her unwillingness to seek out the correct information or correct it when [it was] brought to her attention, convinces this court that SA [RB] acted knowingly and intentionally and with reckless disregard for the truth."[5] Notably, the Government did not appeal the trial judge's decision regarding this matter.

## B. Second Suppression Ruling

After the trial judge suppressed the DNA results from the February 2019 search of Appellant's person, Special Agent RD, at the request of the Office of the Staff Judge Advocate, sought a new search authorization in October 2019 from a military judge previously unconnected to this case. In his affidavit accompanying the search request, Special Agent RD included a summarized transcript of a portion of A1C JL's first AFOSI interview, as well as a summary of A1C JL's sec-

---

[5] The trial judge explained her findings with respect to the verbal search request as follows: "Given the short duration of the initial interview and the same day recitation to the search authority, close in time to [A1C] JL's interview, the verbal statements … were given with reckless disregard for the truth." As for the written affidavit, the trial judge found: "SA [RB] was notified her [oral] facts were incorrect, yet there is no evidence she clarified the information given to the search authority. To the contrary, SA [RB] submitted a written affidavit … which included the false information" and "signed the affidavit anyway, attesting to its veracity."

ond AFOSI interview, both of which were conducted in February 2019. Special Agent RD underlined passages in the transcript where A1C JL stated, "I'm pretty sure [Appellant] had sex with me" and "I was gonna go get a rape kit," and where she asked, "[W]hat happens if I get pregnant [from Appellant]?" Importantly, Special Agent RD also underlined a leading question posed by Special Agent RB, to wit, "[W]as it just vaginal intercourse …?" As noted by the trial judge, each of these underlined passages tended to reinforce the Government's contention that Appellant had penetrated A1C JL.

However, Special Agent RD also included in the search request other comments from A1C JL such as "I blacked out completely," and "[when] I woke up [in bed] with him pretty much on top of me[,] I didn't even know if I had clothes on or anything." And, in the context of a question about whether A1C JL recalled Appellant penetrating her or just that he was on top of her, the transcript showed that A1C JL responded, "Just that he was on top of me and like I didn't have any clothes on. Like from, like I can't remember really anything. I just remember waking up to him." Further, the summary of the second interview reflected that A1C JL said she was "unsure" whether she was naked from the waist down when Appellant was on top of her in bed, and she was "unsure" if Appellant vaginally penetrated her. These portions of the affidavit tended to give a broader and more balanced view of what A1C JL remembered about the night in question.

The Government also provided to the military judge who authorized the search an affidavit from the lab employee who had conducted the prior DNA testing on the vaginal swabs from A1C JL and on the evidence collected from Appellant. The lab employee stated in the affidavit that he had identified two male contributors on the vaginal swabs. He said one contributor was the third airman who had admitted to having sexual intercourse with A1C JL on the night in question, but the other contributor was an "unknown male." This declaration was not accurate. At the time the lab employee completed this affidavit, he knew that the second profile matched Appellant's DNA profile. That is because this same lab employee had previously analyzed Appellant's DNA in the course of the initial February 2019 search authorization, the results of which had previously been suppressed by the trial judge.

Based on the information before him, the military judge authorized AFOSI to obtain buccal swabs from Appellant in order to analyze his DNA. However, the trial judge later granted a motion by Appellant to suppress this October 2019 search and seizure of Appellant's DNA. She did so on two grounds.

First, the trial judge determined that SA RD deliberately or recklessly omitted information,[6] ruling that the Government had deprived the military judge who authorized the search "the full picture of evidence and information" in the case and, "like previously," had tried to "pick and choose what facts to provide." The trial judge focused on four particular points: (1) SA RD failed to include in the affidavit that A1C JL had told the sexual assault nurse examiner that "her clothing was on when she woke up" in bed with Appellant, and that A1C JL did "not recall any details of the events that occurred"; (2) SA RD failed to include in the affidavit that a third airman had told AFOSI that Appellant and A1C JL were clothed when they emerged from the bedroom; (3) SA RD failed to include in the affidavit that this third airman had admitted in two separate interviews, and not just in one interview, that he had sex with A1C JL on the night in question; and (4) SA RD failed to include in the affidavit that A1C JL was living with an ex-boyfriend, which could explain the presence of DNA from a second male on A1C JL's vaginal swabs. The trial judge ruled that if this information had been included in the affidavit, it "would have extinguished probable cause."

---

[6] The trial judge also referred to deficiencies in the affidavit of the lab employee, including that the affidavit contained a "false statement." Specifically, she noted that the affidavit failed to state that the lab employee had previously tested Appellant's DNA, and failed to state that the lab employee already knew at the time of the October 2019 search authorization request that the DNA from the "unknown male" actually matched Appellant's DNA profile. However, neither of these points seemed to play a substantial role in the trial judge's suppression analysis, and Appellant focuses his arguments in this Court on the omissions in SA RD's affidavit. In addition, there is no material difference in Appellant's case between saying an "unknown male" (which was false) and using another term such as "another male" (which would have been true). We therefore do not address the deficiencies in the lab employee's affidavit here.

Second, the trial judge concluded that the October 2019 DNA evidence was derivative of the tainted evidence from the first search because the Government's failure to use "a new, untainted investigator and … a new, untainted [lab] analyst" meant that there was no "clean, untainted examination of the case," which "colored how the Government … presented the case to the" military judge who authorized the search. The trial judge rejected the Government's reliance on the independent source doctrine because A1C JL's AFOSI interviews, the third airman's AFOSI interview, and the untainted lab analyses involving A1C JL and the third airman did not provide an independent basis for probable cause. Instead, she found that "the Government's decision to seek a new search authorization was prompted by information gathered during the prior illegal search and only a result of having that search suppressed." The trial judge then granted the defense motion to suppress evidence obtained from the October 2019 search and seizure of Appellant's DNA evidence.

## C. Appellate Proceedings

The Government filed an Article 62, UCMJ, appeal with the AFCCA challenging the trial judge's second suppression ruling. The AFCCA held that the trial judge abused her discretion when she found that "inclusion of the omitted information in a corrected affidavit would have extinguished probable cause" and when she "applied an erroneously heightened legal standard for probable cause." *United States v. Garcia*, Misc. Dkt. No. 2019-07, 2020 CCA LEXIS 107, at *51, 2020 WL 1860100, at *18 (A.F. Ct. Crim. App. Apr. 10, 2020). The AFCCA further held the trial judge abused her discretion when she determined that the October 2019 search and seizure of DNA evidence was derivative of the first search and that this DNA was not obtained from an independent source. *Id.* at *57–64, 2020 WL 1860100, at *21–22. We granted Appellant's petition for review under Article 67(a)(3), UCMJ, 10 U.S.C. § 867(a)(3) (2018). *Garcia*, 80 M.J. at 278.

## II. Standard of Review

In Article 62, UCMJ, cases, we pierce the lower court's decision and review the trial judge's suppression ruling directly for an abuse of discretion. *United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017). Moreover, this Court examines the evidence

in a light most favorable to the party which prevailed at trial, which is Appellant in this case. *United States v. Lewis*, 78 M.J. 447, 452 (C.A.A.F. 2019). When conducting our discretionary review of the trial judge's suppression ruling, this Court "review[s] factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard." *United States v. Gurczynski*, 76 M.J. 381, 385 (C.A.A.F. 2017) (citation omitted) (internal quotation marks omitted). "A finding of fact is clearly erroneous when there is no evidence to support the finding, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018) (citations omitted) (internal quotation marks omitted). An abuse of discretion occurs when a trial judge makes clearly erroneous factual findings or when the trial judge misapprehends the law. *United States v. Eugene*, 78 M.J. 132, 134 (C.A.A.F. 2018).

### III. Analysis

Appellant defends the trial judge's suppression ruling on two grounds: (1) the trial judge properly determined that Special Agent RD's deliberate or reckless omissions from his search authorization affidavit extinguished probable cause; and (2) the trial judge properly concluded that the independent source doctrine did not apply. We address these arguments in turn.

### A. Omissions from the Search Authorization

### 1. Applicable Law

An accused may challenge a search authority's probable cause determination on the basis that law enforcement knowingly or recklessly misstated information in, or omitted material information from, an affidavit in support of the search authorization. *Mason*, 59 M.J. at 422 ("Neither [the Military Rules of Evidence (M.R.E.)] … nor *Franks* expressly extends to omissions. Logically, however, the same rationale extends to material omissions."). This Court applies the M.R.E. 311(d)(4)(B) framework to evaluate these claims of intentional or reckless misstatements or omissions. *See United States v. Figueroa*, 35 M.J. 54, 56–57 (C.M.A. 1992). Military Rule of Evidence 311(d)(4)(B) and "'*Franks* protect[] against

omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the [search authority].'" *Mason*, 59 M.J. at 422 (quoting *Colkley*, 899 F.2d at 301). In this context, our evaluation of the trial judge's second suppression ruling encompasses a two-step process using different standards of review.

As a first step, we examine the trial judge's findings that the Government omitted relevant information from the October 2019 affidavit, and that the Government did so recklessly or intentionally. *See United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019). These are questions of fact. *Id.*; *see also Mason*, 59 M.J. at 422. Assuming that the trial judge's finding of fact regarding these issues is not clearly erroneous, as a second step, we conduct a de novo review to determine whether those reckless or intentional omissions were material because their inclusion in the affidavit would have extinguished probable cause.[7] *See Crawford*, 943 F.3d at 309; *see also Ornelas v. United States*, 517 U.S. 690, 697–98 (1996); *Mason*, 59 M.J. at 422 (holding that "even if [omitted] information had been included in the affidavit, none of it would have prevented a finding of probable cause").

## 2. Discussion

With respect to the second suppression ruling, we assume without deciding that the trial judge did not clearly err in finding that "the Government intentionally and recklessly omitted information from the search [authorization] affidavit." Thus, the central question before us is whether the inclusion of this omitted information would have extinguished probable cause in the search authorization request.

In making this determination with respect to the second suppression ruling, we first examine the affidavit and accompanying material as it was presented to the military judge who authorized the search to determine whether probable cause initially existed. It is a fundamental fact that "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley, v. United States*,

---

[7] Information is "material" if it is "[o]f such a nature that knowledge of the item would affect a person's decision-making." *Black's Law Dictionary* 1170 (11th ed. 2019).

571 U.S. 320, 338 (2014)). This Court is simply required "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit …, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); M.R.E. 315(f)(2).

Here, "the circumstances set forth in the affidavit" included the following: Appellant knew that A1C JL was drinking heavily on the night in question; Appellant signaled to another airman that he was interested in having a "threesome" with A1C JL that evening; while the other airman was in a different room, Appellant went into the spare bedroom where A1C JL was sleeping; despite the fact that it was his quarters and he presumably had his own bed in a different room, Appellant got into bed with A1C JL; when A1C JL awakened, she discovered that Appellant was not just lying beside her but rather was "on top of" her; Appellant's later explanation for this scenario was that he simply was looking for some shorts in this spare bedroom; Appellant woke up A1C JL between 3:00 and 4:00 in the morning and was adamant that she needed to take a shower, and he was standing in the bathroom with a naked A1C JL insisting that she do so; and Appellant got "really mad" at A1C JL's refusal to take a shower[8] and his later explanation for his reaction was merely that A1C JL had spilled beer on herself and he wanted her to wash it off. And finally, the lab employee's affidavit indicated that the DNA from A1C JL's vaginal swabs included male DNA from *two* contributors, not just from the third airman in Appellant's apartment.

Our commonsense assessment of the totality of these circumstances is that there was a fair probability that the DNA evidence from the third person would match the DNA profile of Appellant. Therefore, upon de novo review of the second suppression ruling, we conclude that the facts contained within the affidavits supported a probable cause determination to obtain buccal swabs from Appellant in October 2019.

We next consider whether the information that the Government deliberately or recklessly omitted from Special

---

[8] A1C JL told AFOSI that she declined to take a shower because she believed Appellant wanted her to wash away his DNA evidence.

Agent RD's affidavit served to extinguish probable cause. As noted above, the trial judge cited four key pieces of omitted information that caused her to conclude that probable cause was indeed vitiated.

First, the trial judge focused on the fact that SA RD failed to include in the affidavit that A1C JL had told the sexual assault nurse examiner that "her clothing was on when she awoke" in the spare bedroom with Appellant, and that A1C JL did "not recall details of the events that occurred." However, we initially observe that the nurse's notes were not an extensive transcription of A1C JL's comments. Further, other parts of the affidavit made it abundantly clear that, due to her high level of intoxication, A1C JL could not recall with precision whether she was clothed or not. For example, at one point she told the AFOSI special agents that she "didn't even know if [she] had clothes on" and at another point she said she was "unsure" if her pants and underwear were on. Similarly, the affidavit made it clear that A1C JL's recollection of the events in question was very hazy due to her intoxication. Thus, this first omission cited by the trial judge does not serve to extinguish the probable cause in this case.[9]

Second, the trial judge asserted that SA RD failed to include in the affidavit that a third airman had told AFOSI that Appellant and A1C JL were clothed when they emerged from the bedroom. However, the trial judge's finding is clearly erroneous because SA RD's affidavit actually does state that this third airman informed AFOSI that Appellant and JL "both came out to the living room *clothed*." (Emphasis added.) Further, A1C JL's state of dress when she emerged from the spare bedroom has little if anything to do with whether Appellant had sexually assaulted her previously inside the bedroom. *See Garcia*, 2020 CCA LEXIS 107, at \*55, 2020 WL 1860100, at \*20.

---

[9] We additionally note that government agents are not required to provide all relevant information in seeking a search authorization. *See Colkley*, 899 F.2d at 303 (holding that "a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it").

Third, the trial judge noted that SA RD failed to include in the affidavit that the third airman at Appellant's apartment had admitted in two separate interviews, and not just in one interview, that he had engaged in sexual intercourse with A1C JL on the night in question. Of course, the airman's admission undercuts the probable cause value of A1C JL's subsequent observation that she felt as if someone had sex with her. However, we conclude that the inclusion of a second reference to the airman's admission was merely cumulative evidence and would not have extinguished probable cause.[10]

Fourth, and finally, the trial judge relied on the fact that SA RD failed to include in the affidavit that A1C JL was living with an ex-boyfriend, which could explain the presence of DNA from a second male on A1C JL's vaginal swabs. However, we view the trial judge's unsupported conjecture that A1C JL had recently engaged in sex with this ex-boyfriend as being too tenuous to extinguish the probable cause determination. *See Wesby*, 138 S. Ct. at 588 ("[P]robable cause does not require ... rul[ing] out ... innocent explanation[s] of suspicious facts."). The trial judge's speculation is further undermined because A1C JL spent the night at Appellant's apartment on the night of the alleged sexual assault, and there is no evidence that the ex-boyfriend was present at the apartment.

In light of these points, we conclude that the omitted pieces of information cited by the trial judge, whether considered individually or cumulatively, did not extinguish probable cause. Stated differently, our de novo review of all of the relevant information in this case, to include the previously omitted information, leads us to conclude that there was probable cause to obtain Appellant's buccal swabs in October 2019. Therefore, the trial judge abused her discretion in finding

---

**10** Appellant claims that this first interview was inconsistent with the second because the airman stated Appellant was alone in the bedroom with A1C JL only for one to two minutes and omitted any reference to Appellant wanting to have a threesome. However, the trial judge did not specifically examine these discrepancies in her analysis or comment on them in her findings of fact. Appellant does not claim that the trial judge clearly erred by omitting these conflicting statements from her findings of fact.

that the omissions were material. "[U]nder *Franks*, an omission must do more than potentially affect the probable cause determination: it must be 'necessary to the finding of probable cause.'" *Colkley*, 899 F.2d at 301 (quoting *Franks*, 438 U.S. at 156); *see also* M.R.E. 311(d)(4)(B).

We additionally conclude that the trial judge abused her discretion because she misapprehended the law. She cited the need for the Government to "provide a complete picture to the search authority," faulting Special Agent RD for trying "to pick and choose what facts to provide the search authority, thereby denying him the full picture of evidence and information." However, this is not the correct legal standard. An affidavit is not required to include "every piece of information gathered in the course of investigation." *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008) (citation omitted) (internal quotation marks omitted).

## B. Independent Source Doctrine

Our analysis of the second suppression ruling is not finished, however. We next examine whether Appellant's DNA seized from the second search authorization was obtained through an independent source separate from the first unlawful search authorization.

## 1. Applicable Law

Evidence derived from an unlawful search constitutes "fruit of the poisonous tree" and is subject to exclusion. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citation omitted) (internal quotation marks omitted); *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). However, "the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Strieff*, 136 S. Ct. at 2061; *Murray v. United States*, 487 U.S. 533, 537 (1988) (holding that the independent source doctrine applies to "evidence initially discovered during … an unlawful search, but later obtained independently from activities untainted by the initial illegality"). The purpose of the independent source doctrine is to put "the police in the same, not a *worse*, position tha[n] they would have been in if no police error or misconduct had occurred" because if evidence with an independent source were excluded, this "would put the police in a worse position than

they would have been in absent any error or violation." *Murray*, 487 U.S. at 537 (internal quotation marks omitted) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).

## 2. Discussion

The trial judge ruled that Appellant's DNA evidence obtained from the October 2019 buccal swabs must be suppressed because (1) it was derived from the lab employee's prior DNA analysis related to the February 2019 unlawful search, and (2) there was no independent source to support the second search authorization.

In regard to the first point, we note that Appellant's brief does not challenge the AFCCA's conclusion that "[t]he [trial] judge clearly erred in finding [that the lab employee's] second analysis of Appellant's DNA was derived from the first and thus tainted." *Garcia*, 2020 CCA LEXIS 107, at \*62, 2020 WL 1860100, at \*21. Under the particular circumstances presented here, we therefore decline to reexamine this facet of the trial judge's suppression ruling and accept the AFCCA's conclusion that the second DNA analysis was not derived from the first.

In regard to the second point about the independent source doctrine, the trial judge found that "the Government's decision to seek a new search authorization was prompted by the information gathered during the prior illegal search and [was] only a result of having that search suppressed." However, the trial judge clearly erred in making this factual finding because she was laboring under a misapprehension of the law. She seemingly took the position that the information A1C JL and the third airman provided to AFOSI did not establish a crime by Appellant, and that it was the unlawful DNA search and the lab analysis of this DNA that prompted the second search authorization. However, it is essential to note that not all evidence that is gathered either prior to or after an unlawful search is necessarily "fruit of the poisonous tree." *Wong Sun*, 371 U.S. at 488. The only *true* poisonous fruit is evidence that was gathered as a *result* of the unlawful search. *See id.* Here, that poisonous fruit was the DNA lab analysis derived from Appellant's penile swab and initial buccal swab.

14

Further, the trial judge took an erroneously narrow view of the evidence available to make the probable cause determination. Specifically, she misconstrued or ignored certain evidence available to AFOSI that was unrelated to the unlawful search and seizure of Appellant's DNA. This included such evidence as the lab analyses of the DNA evidence taken from A1C JL's vaginal swabs and from the third airman, A1C JL's pretextual text exchange with Appellant, and Appellant's AFOSI interview. As explained in Part III.A.2, this information, along with A1C JL's and the third airman's AFOSI interviews—all of which was unrelated to Special Agent RB's unlawful conduct—provided probable cause to obtain Appellant's DNA a second time. Accordingly, because the trial judge relied on a misunderstanding of the law and the facts in reaching her contrary conclusion in the second suppression ruling, we hold that she abused her discretion by suppressing the October 2019 DNA results.

## IV. Conclusion

We not only understand the trial judge's grave concern about the Government's actions in this case, we share it. Here, a special agent with the AFOSI knew that she had included false material information in an affidavit she was submitting to a search authority, and yet she kept it in the affidavit at the startling recommendation of a member of the Judge Advocate General's Corps. Further, the special agent then attested to the veracity of this inaccurate affidavit. Additionally, in a later search authorization affidavit submitted to a military judge, a different special agent underlined a question—not an answer—in an interview of the complainant that went to the essence of the probable cause determination even though this question had an insufficient factual foundation. This special agent also appended an affidavit from a government lab employee that stated that the DNA recovered from the complainant was from an "unknown male" when, in fact, the lab employee already knew the DNA came from Appellant.

When seeking search authorizations, this Court expects agents of the government to conduct themselves in a manner consistent with the highest standards of professionalism and integrity. Regrettably, certain individuals failed to meet this standard in the instant case. Therefore, although we conclude

that the trial judge should not have excluded the evidence in her second suppression ruling, we do not condemn her well-intentioned goal of seeking to hold the Government accountable for its improper actions.[11]

## V. Judgment

We affirm the decision of the United States Air Force Court of Criminal Appeals. The record is remanded to the Judge Advocate General of the Air Force for return to the trial judge for further action consistent with this opinion.

---

[11] In regard to the characterization of the Government's conduct in the separate opinion, we note the following facts. First, even if Captain KS's intention was to have Special Agent RB simply memorialize the verbal information she conveyed to the search authority, the method chosen—signing an affidavit in which Special Agent RB attested to the veracity of false information—clearly was not the proper approach. At a minimum, Captain KS should have instructed Special Agent RB to include in the affidavit a statement explaining that the affidavit reflected the information she had previously conveyed orally to the search authority and then identify the misinformation for the convening authority. This Court should not be seen as countenancing in any way legal advice that encourages law enforcement agents to knowingly swear to false statements. Second, at the time that Special Agent RB attested to the veracity of the false information, the *seizure* of the DNA evidence had occurred but the *search* of that DNA evidence had not. Thus, the matter presented here is not merely academic. If Special Agent RB and Captain KS had taken the appropriate steps and been candid with the search authority, the course of the search in this case may have been affected. Third, the trial judge in this case made the following factual finding: "SA [RB's] conduct in providing materially false statements to the search authority, coupled with her unwillingness to seek out the correct information or correct it when [it was] brought to her attention, convinces this court that SA [RB] acted knowingly and intentionally and with reckless disregard for the truth." This factual finding by the trial judge is not clearly erroneous and should not be disturbed by this Court, particularly in view of the Government's decision not to appeal the trial judge's first suppression ruling and in view of the Government's agreement in its submission to our Court that "the agent acted recklessly." Appellee's Answer to Supplement to Petition for Grant of Review at 3 n.1, *United States v. Garcia*, No. 20-0262 (C.A.A.F. June 15, 2020).

Chief Judge STUCKY, concurring in the result.

I concur with the majority's bottom line: the trial judge abused her discretion in suppressing the DNA evidence seized from Appellant. I further concur with the majority's counsel that there was a better way for Special Agent (SA) RB and Captain KS to resolve the issues caused by the errors SA RB made in her oral application for the search authorization. I am unable, however, to join the majority's equating their mistakes with the far more serious situation of providing false information to the search authority knowingly and intentionally, or with reckless disregard for the truth.

Because of an expected snowstorm, SA RB sought a search authorization telephonically, instead of with a written affidavit. She briefed Captain KS, a judge advocate, and the search authority orally on why she thought probable cause existed. After the commander verbally authorized the search, SA RB took a completed Air Force (AF) Form 1176, *Authority to Search and Seize*, to the commander's house for his signature. *United States v. Garcia*, Misc. Dkt. No. 2019-07, 2020 CCA LEXIS 107, at *10, 2020 WL 1860100, at *4 (A.F. Ct. Crim. App. Apr. 10, 2020). The document was necessary for the execution of the sexual assault forensic exam (SAFE).

After the search, SA RB thought it appropriate to memorialize in an affidavit what she actually told the commander to avoid the problems of vague or faulty recollections at a later trial. While reviewing her notes, SA RB realized that some of the information she had provided the commander who authorized the search was inaccurate. She asked Captain KS what she should do. Captain KS correctly directed her to complete her affidavit with the information that she actually provided the search authority, even though some of it was inaccurate, because that was the information on which the commander based his grant of the authorization. The commander swore her to that affidavit and she signed it.

The correct practice, of course, would have been for SA RB to include in her written affidavit that some of the information she had previously provided was inaccurate. Further Captain KS should have directed SA RB to immediately seek another search authorization from an authority untainted by

the incorrect information. But neither was attempting to mislead the commander or obtain another search authorization. They were trying to ensure the record accurately reflected the "facts" as they had been presented to the commander when he authorized the search. When called to testify on the motion to suppress, both testified to their mistakes.

Under the circumstances, I think the majority's characterization of what appear to be honest mistakes, is somewhat overblown.